(No. 58729.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SAMUEL MORGAN, Appellant.

*Opinion filed April 18, 1986.—Rehearing denied June 2, 1986.*

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and Beth Herndobler, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Samuel Morgan, was charged by indictment in the circuit court of Cook County with the murders of William Motley and Kenneth Merkson (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2)) and the rape (Ill. Rev. Stat. 1981, ch. 38, par. 11—1) and aggravated kidnaping (Ill. Rev. Stat. 1981, ch. 38, pars. 10—2(a)(3), (a)(5)) of Phyllis Gregson. A jury found the defendant guilty of all charges. The prosecutor requested a hearing to consider whether the death penalty should be imposed. The defendant waived a jury, and the trial judge, after hearing evidence in aggravation and mitigation, sentenced Samuel Morgan to death on the murder charges (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(d), (h)) and to concurrent extended prison terms of 60 and 30 years for rape and aggravated kidnaping (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)). The death sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). For the reasons set forth below, we affirm defend-

ant's conviction and the sentence of death. We vacate the extended terms of imprisonment imposed for the charges of rape and aggravated kidnaping. Pursuant to Supreme Court Rule 615 (87 Ill. 2d R. 615), we reduce the sentence for rape to 30 years and the sentence for aggravated kidnaping to 15 years.

The evidence shows that at 2 p.m. on January 27, 1982, the defendant, Samuel Morgan, along with William Motley and Kenneth Merkson, arrived at Eliga Prater's third-floor apartment at 1627 West Lawrence in Chicago. The four men talked and used cocaine and marijuana for approximately 15 to 20 minutes. Then Merkson indicated he needed to return to his home to change clothes. Prater exchanged car keys with the defendant, and he, Merkson and Motley left the apartment, leaving the defendant behind.

Phyllis Gregson, who knew both Prater and the defendant, arrived at Prater's apartment at approximately 8:30 that evening. She found the defendant there alone. He invited Gregson to come in, and the two shared two "joints" of marijuana and watched television.

At 9 p.m., two men, whom Gregson did not know, came to the apartment. The two talked with the defendant until around midnight on January 28, 1982. When they left, the defendant and Gregson were again alone in Prater's apartment. At this point, the defendant made sexual advances toward Gregson, which she refused.

Prater, Merkson, and Motley returned to the apartment at approximately 1 a.m. They, along with Gregson and the defendant, proceeded to use more cocaine and marijuana.

At approximately 3 a.m., Prater and Gregson were on the couch in the front room of the apartment, Motley was also in the front room, and the defendant and Merkson were in the bedroom. Prater and Gregson were talking quietly when the defendant called them into the

bedroom and demanded to know what was being said. After Prater answered him, the defendant directed Merkson to hand him a shotgun that was in the bedroom closet. Defendant aimed the shotgun at Prater and Gregson and demanded to know the truth about what they were talking about.

At this point, Gregson told the defendant she wanted to go home. The defendant grabbed Gregson and punched her in the face with his fist and hit her in the chest with the butt of the shotgun, knocking her to the floor. Merkson helped Gregson up and took her into the kitchen. After a few minutes, Gregson went into the front room of the apartment, where she eventually fell asleep on the couch.

In the meantime, Prater and Motley stayed in the bedroom and talked to the defendant. After Merkson returned from the kitchen, the four men used more cocaine until about 5 a.m.

Evidence also revealed that later, at approximately 11 to 11:30 a.m, Motley was sitting on a love seat in the front room of the apartment, talking on the telephone. He was holding a small black book and had a .357 magnum revolver tucked under his leg. Gregson was sitting in the rocking chair in the front room of the apartment. The defendant, with the shotgun in his possession, was sitting in the front room, some six to seven feet from Motley. Prater and Merkson were both in the kitchen.

At this point, the defendant asked Gregson to remove her blouse and dance for him. Gregson refused. She testified that Motley said something and the defendant fired the shotgun at him, hitting him in the left side of his chest. Motley's body flew off the love seat and onto the floor. The defendant grabbed the revolver and put it in the waistband of his pants.

The defendant stepped into the kitchen and told Prater and Merkson to come into the front room and

clean up Motley's body. Merkson removed some money, marijuana, and the small black book from the body. He gave the black book to the defendant. The defendant told Prater to try and fit Motley's body into the dresser drawers from the bedroom. Eventually, the body was bent, tied up in a laundry bag, and wrapped inside a mattress. The defendant told Gregson to clean the blood up off the floor, which she did.

At about 12:45 p.m., the defendant told Prater to go out and buy something to drink, put gas in Prater's car, and park the car at the back of the apartment. Prater left the apartment to run the errands.

When Prater reentered the apartment, Gregson was in the kitchen doing dishes, the defendant was sitting on an end table in the dining room with the shotgun on his lap and the revolver in the waistband of his pants. Merkson was standing around making jokes. Prater gave the defendant a bottle of liquor he had purchased and the men took a few drinks from it.

Merkson continued to make jokes, until the defendant told him to stop and to take Motley's body out of the apartment. Merkson made another remark, and the defendant chased him into the front room of the apartment. There, the defendant hit Merkson in the head several times with the butt end of the revolver. The defendant again told Merkson and Prater to remove Motley's body. Merkson made another remark to the defendant. The defendant then ordered Merkson to get down on his knees.

Eliga Prater testified that he then saw the defendant point the revolver at Merkson's head from a distance of four or five feet. Prater turned and faced the wall. He heard a shot and turned back to see Merkson's body lying on the floor and the defendant standing beside it. Gregson and Prater both testified that they saw the revolver in the defendant's hand as he stood near

Merkson's body.

The defendant ordered Gregson to clean up the blood from the floor around Merkson's body and ordered Prater to get the body out of the apartment. Prater began to tie up Merkson's body and the defendant moved to a point behind him. Prater heard a gunshot and felt the bullet go past his head. He immediately broke and ran through the kitchen, out the back door, and out of the apartment.

At this point, the defendant ordered Gregson to go into the bathroom. She did as she was told, locking the door behind her. After 5 or 10 minutes, the defendant ordered Gregson to come out. When she did, the defendant still had possession of the revolver, but she did not see the shotgun. The defendant then took Gregson by the arm and the two left the apartment through the front door at approximately 1:30 p.m.

Prater's downstairs neighbor, Frank Blume, testified that between 11 a.m. and 1:15 p.m. on January 28, 1982, he heard several loud shattering sounds coming from Prater's apartment. After the last one, Blume noticed that a hole had appeared in the ceiling of his apartment. Blume next heard the sounds of one or more people running down the back stairs from the third-floor apartment. After a few minutes, Blume called the police.

The police arrived at approximately 1:30 p.m. Upon entering Prater's apartment they discovered the bodies of Motley and Merkson. The police recovered from the apartment a loaded shotgun, a fingerprint from a dresser drawer later identified as the defendant's, and a bullet from the floor directly below Merkson's body. The police also recovered a bullet from the apartment directly below Prater's.

Phyllis Gregson testified that after leaving the apartment, the defendant had driven to a motel. The defendant held Gregson by the arm and took her out of the car

and into the lobby. The defendant still had the revolver under his coat. Other testimony revealed that the defendant registered in the name of Joseph Thurston, a name he had previously used. The defendant and Gregson proceeded to room 307.

Upon entering the room, Gregson went into the bathroom. When she came out, she did not see the revolver in the defendant's possession and testified that she did not know where it was. After spending approximately 20 minutes in the room, the defendant began to undress Gregson. She told the defendant that she did not want to have sex with him, but the defendant finished removing her clothes, pushed her onto the bed, and had sexual intercourse with her. Upon dressing, the defendant removed the revolver from under a chair cushion and again placed it in the waistband of his pants. The defendant and Gregson spent a total of approximately two hours in the motel room.

Upon leaving the room, the defendant and Gregson encountered an employee of the motel, Tommie Lee Cowans, who testified that he noticed that the defendant had a large silver plated revolver pointed at Gregson's head. Upon seeing Cowans, the defendant pointed the gun at him. Cowans immediately turned and ran toward the motel lobby. The defendant chased him for a short distance, then returned, again took Gregson by the arm, and led her out to his car. Cowans testified that he observed the defendant pushing Gregson into the car head first.

Gregson testified that after driving on various side streets, defendant stopped the car and told her to get out. He threatened Gregson, warning her not to tell anyone of the incident or he would come and find her. The defendant then drove off at a rapid rate of speed.

The next day, January 29, 1982, Chicago police officers, while investigating an unrelated disturbance, ar-

rested the defendant. The officers called to the defendant to stop. The defendant did not stop but continued walking. The officers then identified themselves as police. The defendant dropped a plastic bag to the ground and continued walking. The police pursued him on foot. When they were within approximately 15 to 20 feet of him, the defendant turned toward the officers and pulled a revolver from his coat pocket. When he saw the officers' guns he dropped the revolver. The officers took the defendant into custody and recovered the revolver, the plastic bag, and its contents.

Later that same day, Eliga Prater contacted the police and informed them that the defendant was responsible for the deaths of Motley and Merkson. Gregson was contacted by the police, and she confirmed Prater's statement.

At trial, expert testimony showed that the revolver, recovered from the defendant upon his arrest, had fired the bullets recovered at the apartment house. The plastic bag that the defendant dropped prior to his arrest was found to contain a black notebook. Prater and Gregson identified the book as being the one Merkson had given to the defendant after removing it from Motley's body.

A jury that had been qualified pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, returned a verdict of guilty on all charges. The State requested a hearing to determine if the defendant should receive a death sentence (Ill. Rev Stat. 1981, ch. 38, par. 9—1(d)), and the defendant waived his right to a jury at the penalty hearing. The court found that the defendant was eligible for capital punishment based on his conviction of the murder of two persons. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3).

The court then heard evidence in aggravation and mitigation. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(h).) The court specifically found that a statutory aggravating fac-

tor existed and that there were no mitigating factors sufficient to preclude the imposition of the death sentence. The court therefore sentenced the defendant to death for the murders of William Motley and Kenneth Merkson. The court also imposed concurrent extended prison terms (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)) of 60 years for the rape of Phyllis Gregson and 30 years for her aggravated kidnaping.

The death sentence was stayed under the provisions of Supreme Court Rule 609 (87 Ill. 2d R. 609(a)), pending the final order of this court. The case is before us on defendant's right to direct appeal. Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603.

The defendant first argues that his convictions should be reversed and a new trial ordered because he was denied his right to a fair trial by the prosecution's improper questioning during *voir dire* and various improper arguments.

During jury selection, the prosecution asked the following question:

"MR. LINN [prosecutor]: *** You understand that we are responsible for calling the witnesses that can help you render that decision, and the witnesses that we will be calling are the people who were involved in the case we will call who were there. If it turns out that you have some disagreement with the lifestyles of these people, would you nonetheless be able to believe them if you found in your own mind that they were telling you the truth?"

After defense counsel objected, the prosecutor was asked to rephrase his question. Several additional attempts were made to ask the same question, with defense counsel's objection sustained after each one. The prosecution ended the series of questions by asking whether the juror understood that the circumstances decided who would be the witnesses to a particular crime.

This question was not objected to. Defendant now maintains that this series of questions necessitates a new trial.

Supreme Court Rule 234 provides that during *voir dire* "[q]uestions shall not directly or indirectly concern matters of law or instructions." (87 Ill. 2d R. 234.) This court has noted that "an attorney on *voir dire* examination of jurors has a right to make such reasonable inquiry as will permit him intelligently to exercise his right of peremptory challenge \*\*\*." (*St. Clair Housing Authority v. Quirin* (1942), 379 Ill. 52, 57.) The extent of the proper exercise of his right lies within the judicial discretion of the trial court. (379 Ill. 52, 57.) Defendant correctly notes that one Illinois court has held that in the exercise of this right, no opportunity must be given to indoctrinate a juror, even slightly. *Christian v. New York Central R.R. Co.* (1960), 28 Ill. App. 2d 57, 67.

We find that the *voir dire* examination did not deny defendant his right to a fair trial. It cannot be said that the final question in the series, the only one allowed to stand, violated Supreme Court Rule 234. It neither directly nor indirectly concerned a matter of law or instruction; it was simply a matter of common sense. The defendant cannot argue that the trial court abused its discretion by allowing *voir dire* to proceed beyond its proper scope. Objections to the prosecution's improper questions were immediately sustained. Nor can it be said that the series of questions at issue indoctrinated the jurors to the prosecution's point of view. The questions did not specify what type lifestyle was involved, nor could the tone or content of the questions be said to predispose the jurors *towards* the testimony of any witness. We cannot say, based on the record, that these few questions impinged upon the defendant's right to a fair trial.

The trial record discloses that the following statements were made regarding Eliga Prater and Phyllis

Gregson during the prosecution's closing argument in the guilt phase of defendant's trial:

"MR. LINN [prosecutor]: * * * You may not like them. You may not like what they represent. * * * You may not want them as your nextdoor neighbors, but remember, they are not our witnesses, We didn't choose them.

* * *

MR. LINN: * * * We brought the people in that were there.

MR. LINN: * * * We don't pick the witnesses, the defendant does.

* * *

MR. LINN: The witnesses are not on trial."

Defendant argues that the prosecution's burden of proof is to show by *credible* evidence that the defendant is guilty beyond a reasonable doubt. By suggesting that the jury need not judge or be critical of the witnesses, the defendant insists that the prosecution attempted to lessen this burden of proof. Defendant maintains that such an argument constitutes reversible error. (See *People v. Johnson* (1981), 102 Ill. App. 3d 122; *People v. Martinez* (1979), 76 Ill. App. 3d 280.) We do not agree.

In both *Johnson* and *Martinez*, the prosecution's arguments clearly suggested to the jury that the prosecution's burden of proving guilt beyond a reasonable doubt was merely a *pro forma* or minor detail. (*People v. Johnson* (1981), 102 Ill. App. 3d 122, 125; *People v. Martinez* (1979), 76 Ill. App. 3d 280, 285.) That is not the case here. The statements at issue make no mention of the reasonable-doubt standard. Nor do they indicate that the credibility of the witnesses or the prosecution's burden of proof is a minor detail. For these reasons, we find defendant's contention to be without merit.

During rebuttal, the prosecution responded to defense counsel's attempts to discredit the eyewitnesses by stating:

"MR. LINN: *** And if [defense counsel], through his cross-examination or his argument, if he tries to bring them down and discredit them, all he does is discredit the defendant because there were all friends together. These are the persons that the defendant came to visit. He came to see them. They were friends."

No objection was made by defense counsel following this statement. Defendant argues that the prosecution impermissibly initiated an inquiry into the defendant's character for the purpose of establishing guilt and that under prior Illinois decisions such conduct requires the granting of a new trial. *People v. Lindgren* (1980), 79 Ill. 2d 129; *People v. Nash* (1966), 36 Ill. 2d 275, *cert. denied* (1967), 389 U.S. 906, 19 L. Ed. 2d 223, 88 S. Ct. 222; *People v. Harbold* (1984), 124 Ill. App. 3d 363.

We do not agree with defendant's contention. Attorneys are allowed considerable leeway in making closing and rebuttal arguments. "The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge *** properly exercised the discretion vested in him." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) The statement of the prosecutor could reasonably be classified as a comment on the evidence presented at trial. The eyewitnesses both testified that they had previously met the defendant and that they used cocaine and marijuana on the date in question. We can find no abuse of the trial judge's discretion in allowing this statement to be made.

We do not agree that the cases cited by the defendant mandate that we reverse his conviction and grant a new trial. In all of the cases cited, testimonial evidence regarding the evil character of the defendant was presented and argued as an attempt to prove guilt. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 134-37; *People v. Nash* (1966), 36 Ill. 2d 275, 279-80, *cert. denied* (1967), 389

U.S. 906, 19 L. Ed. 2d 223, 88 S. Ct. 222; *People v. Harbold* (1984), 124 Ill. App. 3d 363, 384-85.) The prosecution in this case presented no evidence of Samuel Morgan's evil character in order to prove his guilt and, as previously noted, the argument could be classified as simply permissible comment on the evidence presented.

Even if we assume that the prosecution's remarks were improper, they "generally do not constitute reversible error unless they result in substantial prejudice to the accused." (*People v. Baptist* (1979), 76 Ill. 2d 19, 29.) Taking all of the evidence presented at trial, we cannot say that the verdict would have been different absent this single isolated remark made during rebuttal. We therefore decline to reverse defendant's convictions and order a new trial based on this comment. Also, the remarks were not objected to. In the absence of plain error, this issue has been waived. Plain error clearly is not applicable. See *People v. Precup* (1978), 73 Ill. 2d 7; *People v. Pickett* (1973), 54 Ill. 2d 280.

Also, during its closing argument, the prosecution stated that the two eyewitnesses, Prater and Gregson, stayed at the police station for three days after giving their statements because they "did not know that Samuel Morgan was in custody at that time." Defendant maintains that the evidence did not support this statement, and that therefore it amounted to the prosecutor's own testimony. We note that defendant failed to object at trial to this statement, and as in the case of the previous question, it is waived. Furthermore, a review of the testimony presented at trial supports the prosecution's statement. Under direct examination by defense counsel, Detective Thomas Whalen testified that Eliga Prater had "decided to stay" at the station. Assistant State's Attorney Thomas Epach, again on direct examination by defense counsel, testified that Mr. Prater was free to leave the police station after making his state-

ment but that he asked to be allowed to stay because "he feared for his life." Phyllis Gregson also testified that she was frightened. Mr. Epach also testified that at the time of this request, the defendant had not yet been taken into custody. We see no error in the prosecutor's statement.

Defendant next contends that his convictions should be reversed because the prosecution's references to his decision not to testify denied him the right to a fair trial. See *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *People v. Wollenberg* (1967), 37 Ill. 2d 480.

In its closing remarks, the prosecution summarized the circumstantial evidence linking the defendant to the homicidal deaths of Motley and Merkson. The prosecutor concluded the summary by asking the jury, "Don't you think that somebody has some explaining to do?" Defense counsel's objection to the remark was sustained, and the jury was instructed to disregard the statement. The prosecutor then apologized for any misstatement of the evidence he may have made. On rebuttal argument, the prosecution stressed that the defendant had been "in control" of who would be the witnesses and had "picked" them by committing the charged offenses in their presence and that the defendant had presented his defense "through his lawyer." It was also noted that the defendant "had his opportunity to confront the witnesses against him and bring his evidence forward." Objections were overruled as to the first two comments and sustained as to the last.

We do not agree that defendant's right to a fair trial was violated. The appropriate test for whether a defendant's right to remain silent has been violated is whether the reference was intended or calculated to direct the jury's attention to his silence. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350; *People v. Hopkins* (1972), 52 Ill. 2d 1, 6;

*People v. Miller* (1983), 120 Ill. App. 3d 495, 503.) In *People v. Burton* (1969), 44 Ill. 2d 53, this court found that a prosecutor's direct and unequivocal references to the defendant and the fact that certain evidence had not been explained could only have been intended or calculated to call attention to his silence. 44 Ill. 2d 53, 57.

In the present case, the prosecutor's remark was not such a direct and unequivocal reference to the defendant as to constitute a violation of the defendant's right under *Burton*. Nor can it be said that the remark was intended or calculated to draw attention to the defendant's failure to testify. When the prosecutor asked the rhetorical question, "Don't you think someone has some explaining to do?", it was not a comment on defendant's failure to testify. It was instead a comment on the strength of the circumstantial evidence which the prosecutor had summarized just prior to putting the question.

Defendant also maintains that the trial court committed reversible error when it refused to order a mistrial following testimony of a statement allegedly made by the defendant which was not disclosed during discovery. During his testimony regarding the altercation that occurred in the apartment between the defendant and Phyllis Gregson, Eliga Prater stated that the defendant pointed the shotgun at Gregson, placed a pillow over the muzzle, and said "this is what Jews and Italians do when they want to snuff somebody out." This comment had not been included in the discovery material furnished defendant by the prosecutor. Defense counsel immediately objected, and a side bar was held. The trial court, after noting that the defense should have been informed of the substance of the statement during discovery, granted defendant's motion to strike and instructed the jury to disregard Prater's testimony regarding the statement attributed to the defendant. The trial court, however, denied defendant's motion for a mistrial.

Supreme Court Rule 415 (87 Ill. 2d R. 415) provides an array of sanctions for the violation of a discovery rule. A trial court may order disclosure of the material, grant a continuance, exclude the evidence, or enter such an order as seems just under the circumstances. (87 Ill. 2d R. 415(g).) The correct sanction to be applied is left to the trial court's discretion, and the judgment of the trial judge is given great weight (*People v. Weaver* (1982), 92 Ill. 2d 545, 559).

Whether a new trial is warranted by the discovery violation depends on several factors. "The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial." *People v. Weaver* (1982), 92 Ill. 2d 545, 560.) The strength of the undisclosed statement may be considered in determining the proper sanction. (92 Ill. 2d 545, 560.) Declaring a mistrial is a drastic sanction which we do not consider appropriate in this case. The undisclosed statement did not have a bearing on defendant's guilt. The court can, by sustaining an objection and instructing the jury to disregard an improper remark, usually correct any error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577.) We cannot say that the trial judge abused his discretion. Taking into account the remainder of the eyewitnesses' testimony, the expert testimony, and the physical evidence produced at defendant's trial, we are not prepared to say that the evidence was so close or that the prejudice created by the statement was so strong as to require a new trial. Furthermore, we note that during the cross-examination of Gregson, defense counsel elicited this same statement and in his argument to the jury, counsel repeated the statement. Defendant now justifies his use of this statement as an attempt to lessen its impact upon the jury. This may explain defense counsel's reference to the statement in his argument to the jury, but it does not explain why this statement was elicited by him on cross-ex-

amination of a prosecution witness other than the one who had originally testified as to the statement. If defendant was prejudiced in any way by the statement, he, himself, has contributed to the prejudice, and he cannot now complain. For these reasons, we cannot say that the trial court committed reversible error in denying defendant's motion for a mistrial.

Defendant maintains that his conviction for rape should be reversed because the evidence produced at trial was not sufficient to establish that an act of sexual intercourse took place or, if there was an act of intercourse, that it was by force and against the victim's will. The defendant further argues that if the evidence is insufficient to prove that a rape occurred, it is also insufficient to support a conviction of aggravated kidnaping based upon the commission of a felony upon the victim (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)) and that, therefore, his conviction on that charge should be reversed.

In performing our function as a court of review, we should not encroach upon the trier of fact's function of weighing credibility and assessing the evidence presented. (*People v. Reese* (1973), 54 Ill. 2d 51, 57-58.) If the testimony of the complaining witness is clear and convincing or is independently corroborated (*People v. Genus* (1979), 74 Ill. App. 3d 1002, 1009; *People v. Reaves* (1962), 24 Ill. 2d 380, 382), we "will not set aside a finding of guilty unless the evidence is so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused. [Citation.]" *People v. Reese* (1973), 54 Ill. 2d 51, 58.

In this case, the evidence is sufficient to establish that sexual intercourse occurred between the defendant and Phyllis Gregson. Gregson's testimony regarding the drive to the motel, the details of room 307, the events

that occurred there, and her identification of the defendant were clear and convincing. The fact that room 307 was occupied on that date by Joseph Thurston (a name the defendant had used on other occasions) was corroborated by the motel's records.

Phyllis Gregson's testimony that the act of intercourse was by force and against her will was also clear and convincing. Her testimony regarding the defendant's actions toward her was positive and pointed to a nonconsensual act. Furthermore, Gregson's testimony was corroborated by the testimony of the employee who saw the defendant and Gregson leaving the motel.

The degree of force and the amount of resistance required under our rape statute (Ill. Rev. Stat. 1981, ch. 38, par. 11—1) are matters that depend on the facts of the particular case (*People v. Faulisi* (1962), 25 Ill. 2d 457, 461; *People v. Borak* (1973), 13 Ill. App. 3d 815, 818). Resistance on the part of the woman is unnecessary where it would prove futile and would endanger her life as where the assailant is armed with a deadly weapon. *People v. Faulisi* (1962), 25 Ill. 2d 457, 461.

Phyllis Gregson watched the defendant shoot and kill one person and saw him standing with a revolver in his hand beside the body of another. The defendant still had this revolver in his possession during the time he and Gregson were in the motel room. Under those circumstances, the defendant's actions constituted sufficient force, and any greater resistance by Phyllis Gregson undoubtedly would have been not only futile but extremely dangerous.

Since the evidence was sufficient to uphold the defendant's rape conviction, his conviction for aggravated kidnaping based upon the rape of Phyllis Gregson will also stand.

Defendant brings forward two issues in this appeal arising from the trial court's qualification of prospective

jurors, pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. First, defendant maintains that the qualification denied him his right to a jury drawn from a fair cross-section of the community. Second, he maintains that the qualification of jurors resulted in a jury which was biased in favor of the prosecution.

We note initially that defendant's trial counsel waived these issues by failing to object to the qualification process. (See *People v. Davis* (1983), 97 Ill. 2d 1, 24.) Further, we do not consider the evidence in this case to be so closely balanced as to call for the invocation of the "plain error" rule. (See 87 Ill. 2d R. 615(a); *People v. Howell* (1975), 60 Ill. 2d 117, 121.) The issue of whether there was a violation of the right to a jury drawn from a fair cross-section of the community was not argued in the brief and was therefore waived. 87 Ill. 2d R. 341(e)(7).

Moreover, this court has held that the holding in *Witherspoon* applies only to sentences and does not affect in any way the validity of a conviction. (*People v. Wright* (1974), 56 Ill. 2d 523, 535-36; *People v. Lewis* (1981), 88 Ill. 2d 129, 147, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307; *People v. Free* (1983), 94 Ill. 2d 378, 401, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200; *People v. Holman* (1984), 103 Ill. 2d 133, 153-54, *cert. denied* (1985), 469 U.S. 1220, 84 L. Ed. 2d 347, 105 S. Ct. 1204.) In this case, the sentencing hearing was conducted by the court and not the jury.

This court has also specifically held that the qualification of jurors under *Witherspoon* does not deny a defendant his right to a jury drawn from a fair cross-section of the community. (*People v. Free* (1983), 94 Ill. 2d 378, 401-02.) "The right to trial by jury or the right to a representative jury does not include the right to be tried

by jurors who have stated that they will refuse to follow the law." 94 Ill. 2d 378, 402.

Finally, this court has rejected the argument that the qualification of jurors pursuant to *Witherspoon* denies a defendant a fair trial because it results in a conviction-prone jury. (*People v. Lewis* (1981), 88 Ill. 2d 129, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307; *People v. Caballero* (1984), 102 Ill. 2d 23, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. Collins* (1985), 106 Ill. 2d 237; *People v. Perez* (1985), 108 Ill. 2d 70.) Defendant asks that we reconsider our rejection of these issues but fails to provide any support for this request. In light of this fact and our view that there is "no constitutional violation in excluding from the jury those who will not under any circumstances follow the law as given to them in the instructions" (*People v. Caballero* (1984), 102 Ill. 2d 23, 45), we see no need to do so.

Defendant maintains that his death sentence should be reversed because his waiver of the jury at the death penalty hearing was not "an intentional relinquishment or abandonment of a known right or privilege" (*Johnson v. Zerbst* (1937), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023) due to the trial judge's alleged misstatement of the law.

Under the Illinois death penalty statute, a defendant has a right to a jury in the sentencing phase of trial. Before the death penalty may be imposed, there must be a unanimous finding by the jury that one or more of the aggravating factors exist and there must be a unanimous finding by the jury that there are no mitigating factors sufficient to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(g).) Shortly after the jury returned its verdicts at the trial phase, counsel informed the court that the defendant desired to waive the jury for purposes of sentencing. The trial judge then

admonished the defendant regarding the findings the jury would be required to make and informed him that the judge would make those findings if the jury were waived. The transcript continues:

"THE COURT: And now your lawyer says that you want to give up that right of having twelve people, is that true?

THE DEFENDANT: Well, *** after discussion *** with my attorney, *** I have come to the conclusion that *** I don't feel that my family should go through any further hardship, *** go through any further proceedings, you know, like with the twelve that just found me guilty.

THE COURT: You do have the right to have twelve people decide that question, *twelve minds must come out with a unanimous verdict, they all have to agree as to whether you should be given the death penalty or not.*

THE DEFENDANT: Well—

MR. DECKER [Defense counsel]: One moment.

[Short pause]

THE DEFENDANT: I will sign it then.

MR. DECKER: Your Honor, I just informed Mr. Morgan that the procedure is basically the same. It is just that the ultimate decision maker in this case would be the Court, if he waives the jury, as opposed to a jury. I have informed him that the same factors are involved in making the determination. I have informed him that should he waive the jury, then the Court makes the ultimate determination after hearing all of the evidence which is relevant for a sentencing hearing.

THE COURT: Do you fully understand?

THE DEFENDANT: Yes, I fully understand.

* * *

THE COURT: And you understand if you give up your right to have twelve people to decide that question, *that is a unanimous vote, they all have to agree before they can come out with a decision of whether they will impose the death penalty or not,* you understand?

THE DEFENDANT: Yes, I understand.

* * *

THE COURT: You feel that sufficient time and efforts were made to go over the question of whether a jury should be evaluating this question of the death penalty or not of this defendant?

MR. DECKER: I think his decision is being made *intelligently and knowingly*, * * * I think the decision he is making is an intelligent decision, and sufficient time was given to him. I don't think any additional time would make any difference in this matter." (Emphasis added.)

The portion of the record quoted above indicates that the defendant had ample opportunity to consult with counsel regarding his decision. It is clear that counsel's advice, not the statements made by the court, had the greatest influence on the defendant's decision. Defense counsel did not object to the court's statements but instead reinforced the fact that defendant had been informed of the ramifications of his decision. In fact, defense counsel went on record as stating that the defendant's decision was an intelligent one.

The defendant contends that the court erroneously advised him that the jury would have to unanimously agree *not* to impose the death penalty. This conclusion is drawn from the inclusion in the admonition of the words "whether or not." This may be one interpretation of these words. However, the common sense reading of the admonition is that there must be a unanimous agreement by the jury "whether to" impose the death penalty. Clearly, the judge informed the defendant that unanimous agreement was required before the death penalty could be imposed. Therefore, if there was not a unanimous agreement to impose the death penalty, that penalty could not be imposed. This would seem to refute the argument that the court's admonition was to the effect that the jury also had to unanimously agree *not* to impose the death penalty. We are not prepared to say that the court erroneously advised the defendant in this re-

gard, and there is nothing in the record to indicate that the defendant gained an erroneous understanding of the law from the court's statement.

Our prior decisions indicate that the trial court " 'was entitled to rely on the professional responsibility of defendant's attorney that when he informed the court that his client waived a jury, it was knowingly and understandingly consented to by his client.' " (*People v. Sailor* (1969), 43 Ill. 2d 256, 261, quoting *People v. Melero* (1968), 99 Ill. App. 2d 208, 212; see also *People v. Albanese* (1984), 104 Ill. 2d 504, 534-36, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) " 'Defendant is not permitted to complain of an alleged error which was invited by his behavior and that of his attorney.' " *People v. Sailor* (1969), 43 Ill. 256, 261, quoting *People v. Melero* (1968), 99 Ill. App. 2d 208, 212.

Contrary to the defendant's contention, we do not find that *People v. Fred* (1974), 17 Ill. App. 3d 730, or *People v. Vanderwerff* (1978), 57 Ill. App. 3d 44, requires that his sentence be vacated. In *Fred*, the record indicated that defense counsel believed the trial court's misstatement of the law to be true. (17 Ill. App. 3d 730, 731.) Thus, even with adequate time to consult with counsel, the defendant in *Fred* could not have made an intelligent waiver of his right. There is no indication here that defense counsel's advice to the defendant was based upon an incorrect assessment of the law. In *Vanderwerff*, the court was dealing with a waiver of the right to counsel. (57 Ill. App. 3d 44, 48.) The only admonitions of his rights the defendant in *Vanderwerff* received were from the trial court judge. In this case, as we have already noted, the defendant had ample opportunity to discuss the ramifications of his decision with his counsel.

During the defendant's sentencing hearing, Chicago

police officer John Gallagher testified that he investigated a reported armed robbery and shooting on October 6, 1976, and discovered that the defendant had "shot two female Blacks in his apartment." The officer acknowledged that he was not present when the alleged shooting occurred and that the charges resulting from the incident were dismissed. Defense counsel requested that the officer's testimony be stricken because it was not probative of the acts in question, and the court denied the request. Defendant maintains that the inability to determine affirmatively from the record that the sentence was not influenced by consideration of the improper evidence requires a new penalty hearing. See *People v. Brownell* (1980), 79 Ill. 2d 508, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59; *People v. Conover* (1981), 84 Ill. 2d 400.

A sentencing body " ' "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come" [citations].' " (*People v. Owens* (1984), 102 Ill. 2d 88, 111, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362.) The evidence considered by the sentencing body must be both relevant and reliable (*People v. Owens* (1984), 102 Ill. 2d 88, 111, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362; *People v. Free* (1983), 94 Ill. 2d 378, 422-23, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200), the determination of which lies within the sound discretion of the trial judge (*People v. Perez* (1985), 108 Ill. 2d 70, 88; *People v. Lyles* (1985), 106 Ill. 2d 373, 414). In Illinois, evidence of other criminal conduct has been admitted as relevant to the question of the defendant's character. (*People v. Owens* (1984), 102 Ill. 2d 88, 111, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362.) Hearsay evidence is not *per se* objectionable, as being unreliable, at the sentencing

phase of trial. *People v. Perez* (1985), 108 Ill. 2d 70, 86-87.

Given the nature of Officer Gallagher's testimony, we cannot find that the trial judge abused his discretion in admitting the evidence as relevant to the sentencing phase of the defendant's trial. In addition, given the facts that the officer compiled the information during an official investigation several years prior to the murder of Motley and Merkson and the defendant's trial, we cannot say that the judge abused his discretion in finding the testimony to be reliable. Therefore, we find no error in the failure of the trial judge to strike this testimony.

Defendant alleges that the prosecution's arguments at the sentencing hearing included five instances of improper remarks and therefore his death sentence should be reversed. We note for the record that none of the remarks listed were objected to at trial, nor were they mentioned in defendant's post-trial motion. Thus, these questions have been waived. *People v. Stewart* (1984), 104 Ill. 2d 463, 488, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368; *People v. Gacy* (1984), 103 Ill. 2d 1, 98, *cert. denied* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410.

Even if we assume that the prosecution's arguments contained the alleged improprieties, the fact remains that the sentencing hearing was conducted by the trial judge acting without a jury. In such a case, the trial judge is presumed to consider only competent and relevant evidence in determining sentence. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 395-96; *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 199; *People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59.) This presumption extends to the arguments and remarks of counsel. (*People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 199-200.) We have recognized that there are "limits to the immunity to improper and prejudicial insinuations which judges are presumed to pos-

sess." (*People v. Nuccio* (1969), 43 Ill. 2d 375, 396.) However, this court has noted that the limit of immunity was not reached where the remarks in question were "brief and of little significance." (*People v. Nuccio* (1969), 43 Ill. 2d 375, 395.) "Unless it affirmatively appears that the court was misled or improperly influenced by such remarks and that they were productive of a \*\*\* sentence contrary to the law and the evidence, we will not reverse." *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 200.

We need not discuss the nature of the alleged erroneous comments. We note, however, that the five allegedly improper arguments attributed to the prosecution were brief and of little significance. In addition, from the trial court's comments at sentencing regarding the nature of the defendant's acts it appears that these alleged improprieties had little to do with the sentence imposed by the court. We cannot say that it affirmatively appears that the court was misled or improperly influenced by these remarks. We therefore see no reason to vacate defendant's death sentence based on these alleged improprieties.

During *voir dire* the trial court questioned prospective jurors as to the law stated in Illinois Pattern Jury Instructions, Criminal, Nos. 7A.02 and 1.01(5) (2d ed. 1981) (hereinafter cited as IPI Criminal 2d), asking whether they could keep sympathy out of their deliberations. Defendant maintains that his death sentence should not be allowed to stand because the trial court's apparent belief that it should not be influenced by sympathy or prejudice in imposing sentence violated the provisions of the eighth and fourteenth amendments of the United States Constitution.

This court has specifically rejected defendant's argument in *People v. Stewart* (1984), 104 Ill. 2d 463, 494, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 267, 105 S.

Ct. 2368, and in *People v. Perez* (1985), 108 Ill. 2d 70, 92. Our death penalty statute allows the trier of fact to consider any relevant mitigating factors that a defendant may present. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c).) At the same time, IPI Criminal 2d No. 1.01(5) requires only that the trier of fact deliberate considering the evidence presented at trial and not sympathies or prejudices that may exist. In this case the court and not the jury imposed the penalty. We therefore decline the invitation to reconsider our previous holdings.

Defendant argues that the Illinois death penalty statute is unconstitutional because it arbitrarily and capriciously limits application of the death sentence to defendants who do not require translators or other assistance to be fit for trial. Again, we note that defendant did not bring this objection to the attention of the trial court and did not raise it in his post-trial motions. In any event, we have previously disposed of this issue. (*People v. Stewart* (1984), 104 Ill. 2d 463, 499-502, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368; *People v. Madej* (1985), 106 Ill. 2d 201, 212; *People v. Perez* (1985), 108 Ill. 2d 70, 94-95.) As we indicated in *Madej*, this argument is "based on a serious misunderstanding" (106 Ill. 2d 201, 212) of sections 104—22(b) and 104—26(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, pars. 104—22(b), 104—26(b)).

Defendant also contends that the Illinois death penalty statute is unconstitutional because the sentencer is not required to make a separate finding that the sentence is appropriate and because a defendant bears the burden of proving the existence of mitigating factors. The thrust of defendant's arguments is that the Illinois statute does not guarantee that death is the appropriate punishment in a specific case. See *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954.

This court in *Albanese* determined that a separate

finding that the death sentence is appropriate in a given case would jeopardize the constitutionality of our statute. (*People v. Albanese* (1984), 104 Ill. 2d 504, 537.) As we noted, the vagueness that would result from the use of the term "appropriate" as a final test for determining whether a death sentence should be imposed would inject such an element of uncertainty into the proceedings that such a sentence might be imposed in an arbitrary and capricious manner. 104 Ill. 2d 504, 537.

Furthermore, a finding that a death sentence is "appropriate" in a given case is synonymous with the finding, required under our statute, "that there are no mitigating factors sufficient to preclude the imposition of the *** sentence ***." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(g); see also Ill. Rev. Stat. 1981, ch. 38, par. 9—1(h).) As previously noted, our statute allows the trier of fact free rein to consider any fact or circumstance in the defendant's character or in the nature of the offense in mitigation. (*People v. Silagy* (1984), 101 Ill. 2d 147, 164, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227; *People v. Kubat* (1983), 94 Ill. 2d 437, 502, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199; *People v. Free* (1983), 94 Ill. 2d 378, 420, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.) At the same time, we have held that our statute also provides adequate guidance to the sentencer in making its decision. (*People v. Kubat* (1983), 94 Ill. 2d 437, 504, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199; *People v. Brownell* (1980), 79 Ill. 2d 508, 534, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.) The defendant's contention that a separate "appropriateness" determination must be made is therefore meritless.

Defendant's contention that our statute unconstitutionally places on defendant the burden of proving the existence of mitigating factors has also been rejected by

this court. Under the Illinois statute, the State must prove beyond a reasonable doubt that a specific statutory aggravating factor exists. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(g), (h).) The aggravating factor serves as a necessary prerequisite, without which the death sentence cannot be imposed. (*People v. Kubat* (1983), 94 Ill. 2d 437, 504, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) Mitigating factors are considered only after it is found that an aggravating factor exists. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(g), (h).) The weighing process which takes place after the aggravating factor is established obviates any need to assign the burden of presenting factors in mitigation. " '[S]ince the sentencing authority is given specific evidence to weigh, based upon the particularized circumstances of the case, any "discretion to be exercised is controlled *** so as to produce non-discriminatory application." ' [Citations.]" (94 Ill. 2d 437, 504.) For these reasons, we reject defendant's arguments.

Defendant contends that his death sentence should be overturned because the Illinois death penalty statute does not contain adequate safeguards to prevent the arbitrary or capricious imposition of such a sentence. Defendant urges this court to reconsider its position on various aspects of the Illinois death penalty statute based upon the minority views expressed in *Eddmonds v. Illinois* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271 (Marshall, J., dissenting), *Gacy v. Illinois* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410 (Marshall, J., dissenting), *Albanese v. Illinois* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061 (Marshall, J., dissenting), and *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part). We note that these are minority views, and we decline to alter our previous holdings that our death penalty statute contains adequate safeguards.

Lastly, defendant argues that the trial court erred in imposing extended prison terms for his convictions on the rape and aggravated-kidnaping charges. Section 5—8—2(a) of the Unified Code of Corrections provides that "[a] judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized *** for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2.) Section 5—5—3.2 provides that a court may consider as a reason to impose an extended-term sentence the fact that a defendant was "convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty ***." Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2).

We agree that the extended prison terms for rape and aggravated kidnaping must be vacated. The exceptionally brutal and heinous behavior to which the trial court referred in sentencing defendant did not accompany the kidnaping and rape. That conduct was all associated with the murders. There was no evidence of any brutal or heinous behavior which accompanied the kidnaping and rape.

For the reasons stated above, we affirm the defendant's convictions on all charges. We affirm the death sentence. We vacate the extended-term sentences imposed for the rape and aggravated-kidnaping convictions. Pursuant to Supreme Court Rule 615 (87 Ill. 2d R. 615), we reduce defendant's sentence for rape to 30 years (Ill. Rev. Stat. 1981, ch. 38, pars. 11—1, 1005—8—1(a)(3)), and his aggravated-kidnaping sentence to the maximum of 15 years (Ill. Rev. Stat. 1981, ch. 38, pars. 10—2, 1005—8—1(a)(4)), without remand to the trial court. The clerk of this court is directed to enter an order setting

Wednesday, September 17, 1986, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed*
*as modified.*

JUSTICE SIMON, dissenting:

The jury which convicted the defendant was death-qualified, and a number of prospective jurors who stated that they could not impose the death penalty were excluded for cause. As explained in my dissenting opinion in *People v. Wright* (1986), 111 Ill. 2d 128, 170, I believe that conviction by such a jury violates an accused's right to a jury drawn from a fair cross-section of the community. On this ground I would reverse the convictions and remand for a new trial.

I also dissent from the imposition of the death sentence on the ground that defendant's waiver of a jury at the sentencing hearing was not knowing and intelligent. A waiver cannot be knowing and intelligent if it is based on a mistaken understanding of the law. The explanation of the unanimity rule as it applies to a death penalty hearing that was given to the defendant by the trial court was an inaccurate statement of the law. The "common sense reading of the [court's] admonition" (112 Ill. 2d at 141), contrary to what the majority asserts, is not that there must be unanimous agreement by the jury only to impose the death penalty, but that there must also be unanimous agreement *not* to impose the sen-

tence. The interpretation adopted by the majority may be the "common sense reading" of the admonition by an attorney, but not by a defendant untrained in the law.

The majority takes the position that it was the responsibility of the defendant's attorney to be certain that the defendant understood the rule and that his waiver was, as the attorney represented to the court it was, knowing and intelligent. Unlike the majority, I would require a trial judge to inform a defendant that if he opts for a jury trial at his sentencing hearing, the death penalty can be imposed only if all 12 jurors agree that it should be and, additionally, that if even one juror disagrees, the death penalty cannot be imposed. However, the majority's argument does not even address the fact that the court itself gave an erroneous statement of the law to the defendant. Moreover, there is no way of knowing whether the defendant's attorney gave him an accurate explanation, since no explanation by the attorney appears in the record. The ultimate question is whether the defendant understood the rule correctly when he waived a jury at his sentencing hearing, and the majority's speculation as to whose explanation, counsel's or the court's, "had the greatest influence on the defendant's decision" (112 Ill. 2d at 141) does not answer that question.

This court has thus far declined to adopt a rule that expressly requires a circuit court judge to inform a defendant of the unanimity requirement and its application to a death penalty hearing before accepting a jury waiver. However, when a judge does inform a defendant of the requirement, the explanation must be an accurate statement of the law, or the defendant's subsequent waiver is, in my opinion, invalid because it may be based on a mistaken understanding of the law.

In addition, I believe that the death sentence imposed here was tainted by unreliable evidence allowed by the

judge at the sentencing hearing. Although the court at a death sentence hearing may receive evidence of other criminal acts of the defendant, the judge "must 'exercise care to insure the accuracy of information considered.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496, quoting *People v. Adkins* (1968), 41 Ill. 2d 297, 300.) The majority, while continuing to pay lip service to this principle, has effectively pulled the teeth from the reliability standard.

At the sentencing hearing in this case, the State called a police officer to testify that he had investigated a reported armed robbery at the defendant's apartment several years before and that he had learned that the defendant shot two women during the incident. The majority is satisfied with the reliability of this evidence because the officer "compiled the information during an official investigation" (112 Ill. 2d at 144), even though the charges arising from the incident were ultimately dismissed by the State. In holding that wholly uncorroborated testimony of this type is sufficiently reliable to be considered in a life or death sentencing determination, the majority silently recedes from the principles underlying our prior cases.

There is nothing especially reliable about information simply because it was developed in the course of a police investigation. This is not to disparage police efficiency; the officer conceded that he did not witness the shootings but "knew only what [he] was told." He revealed neither the source of his information nor the basis of his belief that the defendant shot the two women. Since people may lie or give inaccurate information to the police, such evidence cannot be credited without some greater showing.

Indeed, the very purpose for the prophylactic hearsay rule at trial is to eliminate this type evidence, which is particularly likely to be unreliable because there is no

way to test the sincerity, memory, or perception of the informant. While the hearsay rule is inapplicable in the second stage of a death sentencing hearing, this court has not permitted other-crimes testimony without some corroboration of the witness' account.

Corroboration of such testimony can take various forms. For example, the judge is warranted in admitting other-crimes testimony at the sentencing phase when the defendant was actually convicted of the offenses described in the testimony. (See, *e.g., People v. Lyles* (1985), 106 Ill. 2d 373 (testimony "strongly corroborated" by guilty pleas); *People v. Owens* (1984), 102 Ill. 2d 88; *People v. Eddmonds* (1984), 101 Ill. 2d 44.) Even if there has been no conviction for the wrongdoing, other-crimes testimony may be considered reliable when the witness is testifying from "first-hand knowledge" of the events. (*People v. Ramirez* (1983), 98 Ill. 2d 439, 461; see also *People v. Owens* (1984), 102 Ill. 2d 88; *People v. La Pointe* (1981), 88 Ill. 2d 482; *People v. Free* (1983), 94 Ill. 2d 378.) In this situation, the defendant can confront the witness in order to test the reliability of the evidence.

A witness' testimony may also be corroborated by the circumstances or by other reliable testimony. For instance, in *People v. Perez* (1985), 108 Ill. 2d 70, 87, the court held that hearsay evidence that the defendant had indirectly threatened the life of the witness, a prison guard, "was reliable in that it was corroborated by [the guard's] testimony concerning the direct threats against him" by the defendant and the fact that the prison authorities disciplined the defendant for the threats. Finally, in *People v. Brisbon* (1985), 106 Ill. 2d 342, the court found a police officer's testimony that the defendant committed another killing reliable under the circumstances where the information came from the dying victim.

Nothing corroborative of the police officer's testimony was present here. I do not understand how justice permits a sentence of death to stand when it may have been influenced by evidence of such questionable reliability. The court appears to be abandoning any attempt to give meaning to the reliability standard for admission of evidence at the sentencing hearing, and I fear that this will further the arbitrary and capricious imposition of the death penalty in this State.

Finally, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the sentence of death imposed in this case must be vacated.