THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LEE W. JOHNSON, Defendant-Appellant.

Third District    No. 81-250

Opinion filed December 9, 1981.

Robert Agostinelli and Tom Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

L. Patrick Power, State's Attorney, of Kankakee (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE ALLOY delivered the opinion of the court:

Lee W. Johnson was convicted of attempted aggravated arson and resisting a peace officer after a jury trial in Kankakee County. He was sentenced to 10 years on the "attempt" charge and one year on the "resisting an officer" charge. The convictions stemmed from defendant's actions during and after a bizarre domestic dispute involving him and his former girlfriend.

The defendant first contends on appeal that his attempt aggravated arson conviction should be reversed because the evidence did not establish that he took a substantial step toward the crime or that he had

the necessary specific intent to commit aggravated arson. He also argues that he was denied a fair trial where it was brought forth before the jury that he previously had been arrested and where there was prejudicial prosecutorial misconduct in the closing arguments.

The unusual events involved in this case began on November 29, 1980, in Kankakee. Sometime between 2:30 and 3:30 p.m. on that day, two Kankakee police officers were dispatched to a house on the corner of Rosewood and Merchant Streets in Kankakee. The defendant Lee Johnson had called the police for the purpose of having them help him recover a gun that was within the house there. When the officers, in separate squad cars, arrived, Johnson was standing in front of the house. He told them that he had lived in the house with his former girlfriend, Glenda Pankey, and that he had left a gun with her, which she was refusing to return. The officers, accompanied by Johnson, proceeded onto the front porch and Officer Born then knocked on the door. Pankey eventually answered, and let Born in the house. When inside, he noticed that there were another woman and several children present. While Born was inside, Johnson could be heard speaking loudly on the front porch to Officer Osenga. Johnson was upset, repeating that he wanted his gun and that it was in the house. Osenga at the time requested to see Johnson's owner "I.D." card, which he produced, along with a receipt for the gun. The officer then told Johnson that they could not search the house for the gun. The defendant responded, "If I don't get this gun back, I will burn this motherfucking house down."

Officer Born came out of the house several minutes later, telling Johnson that Pankey claimed not to have the gun, but also offered to bring it to the police station when she did. With this, Johnson became even more upset and again threatened to burn the house. Born went back into the house, only to return again with another of Pankey's denials. Johnson became further agitated and continued to spout his threats. At this time, the officers advised Johnson to leave the area since he was causing a disturbance and could be arrested. At trial, Osenga testified that Johnson then told him that he didn't care, that he had been arrested before. Objection to the reference to prior criminal activity was sustained, and the jury was instructed to disregard the reference. A later motion for a mistrial based upon the improper evidence was denied. In any event, after the warning, Johnson left the house, and he walked east on Merchant Street to his own residence, about a half a block away. The two police officers, meanwhile, pulled into a lot, a block away, to talk. Within minutes, they observed Johnson walking north on Rosewood carrying a gasoline can. He walked to the Clark Service Station, directly across from the lot where the two officers sat in their squad cars. He put some gas in the can, paid for it and then headed back down Rosewood. Officer Born

was called to other duty, but Osenga stayed. He then drove south on Rosewood, and upon reaching Pankey's house saw Johnson take two or three steps on the south side of the house while pouring gasoline. Johnson was about a foot away from the house, which had a 1½- to 2-foot concrete foundation, and Osenga could not tell if the gas was hitting the ground or the house. The ground was snow-covered grass and earth. It was a cold and damp day.

When Johnson noticed Officer Osenga, he stopped pouring the gasoline and started to walk away from the house, still carrying the can. Osenga then exited his squad car and told the defendant he was under arrest. Johnson kept walking toward his own residence, setting the gas can down in his front yard. Osenga again told him that he was under arrest. Johnson told Osenga that he would not go with him, whereupon Osenga pulled Johnson from the porch and a scuffle occurred. Johnson tried to run, but Osenga "grabbed" him and pushed him against the house. Johnson pushed back, and then Osenga hit Johnson in the mouth, threw him to the ground, and began handcuffing him. Osenga, after subduing Johnson with the help of another officer who arrived at the scene, then retrieved the gas can, which was half full. The other officer then went to Glenda Pankey's residence, where he was given the defendant's rifle by a woman there. Pankey informed the officer at that time that the gun had been there, as Johnson had indicated, since the previous night. At the police station, a search of Johnson revealed that he had no matches, no lighter, and nothing else which could serve as an ignition source.

At trial, all of the above evidence was presented, and in addition a State arson expert testified concerning the nature of gasoline fires and the necessity of an ignition source for starting such a fire. Defense motions for directed verdicts were denied. No witnesses were called by the defense. Closing arguments were then presented. As several comments by the prosecutor during the arguments are alleged to have denied defendant a fair trial, we set forth those pertinent portions of the closing argument. The prosecutor, in discussing the crime of attempt, informed the jury that impossibility was not a defense to the crime of attempt. Objection that such comment was an incorrect statement of the law was made, it being overruled by the court. The prosecutor then continued discussing the law of attempt, and he informed the jury that the issue was whether the defendant took a substantial step. "The question is not is he dangerously close or almost there—but is this a substantial step?" He later returned to the same point, saying:

> "Don't start writing the law in the jury room about substantial step meaning almost there or dangerously close to a fire, or something like that. * * *. Don't start setting standards of law that don't exist."

Turning then to the reasonable-doubt standard, the prosecutor stated:

"What does reasonable doubt mean? You decide what reasonable doubt is. There is no further definition in the law and no attorney can stand up here and say anything more than a reasonable doubt is a doubt that is reasonable. It is not simply any possibility off the wall that is in your mind—your mind—not in mine nor in Mr. Steffen's—yours—it is any doubts that are reasonable. It is the same burden in every criminal case in the history of the United States. There is nothing special or unusual about this case—about this crime—or about Attempt. Beyond a reasonable doubt is the historic burden upon the People throughout our history. It is met every day. Of course, in some cases it is not met and the people are found not guilty, but it is not a burden that is beyond reach—beyond the horizon—beyond the cloud. It is a burden that is and can be met—frequently."

Finally, during rebuttal argument, the prosecutor repeatedly emphasized to the jury that the State's case was "uncontradicted and unrebutted." After so characterizing the case at the outset, the prosecutor then continued:

"All the evidence of the State is concluded. There is nothing in the Defense case contradicting what I presented. This (holding up Property Card) is the sum total—the whole Defendant's case which was provided by the State. It is our Property Card. I told you about it anyway. All our evidence is uncontradicted. You must be—you must decide the case on the evidence—you can't spout out your own theories. You can't create, if you think there are gaps in the evidence. You must be guided by the evidence—all the evidence that is in this case. The evidence presented by the People—uncontradicted, unrebutted."

After almost five hours of deliberations, the jury returned its verdicts of guilty.

At the presentence hearing, the defendant Johnson testified, giving his version of the events of that day. He stated that he had lived with Pankey and had two children by her, those children being the ones present in the house on the day of the disturbance over the gun. He said that he had come to the house the previous night on Pankey's request, after she told him someone had tried to break in. He took his gun to the house, checked the house over and nailed a window shut. He then slept on the couch. In the morning, Pankey began drinking and the two argued, with Johnson leaving. When he returned, Pankey would not let him in to get his gun. He testified that two other people came to the house and they were drinking and clowning around in the presence of the children. He stated that he called police to help him get the gun out of the house,

before it fell into wrong hands. He also testified that his loud, threatening talk after police arrived was solely to get Pankey's attention so that she would turn over his gun. He denied any intention to burn the house down. He said he only poured a half a cup of gas and that Pankey saw him doing it. He said he had no way of starting the fire and that he saw his children on the porch as he poured the gasoline. Other evidence in mitigation was presented, along with, in aggravation, several prior felony convictions of the defendant. The court thereafter sentenced Johnson to 10 years' imprisonment on the attempt aggravated arson and one year on resisting a peace officer.

■■ The first issue raised is whether the State proved that the defendant took a substantial step toward the commission of aggravated arson, with the intent to commit aggravated arson. (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(a).) The defense contends that the State did not prove either element of the attempt offense. In support of their position, the defense emphasizes that the defendant had no ignition source, that he poured only a small amount of gasoline, and then only next to the house. Further, the defense notes that Johnson called the police to the scene and that his subsequent conduct occurred while the police were nearby, observing from the squad car. The defense argues that the evidence shows only mere preparation, and not a substantial step. As this court stated in *People v. Brown* (1979), 75 Ill. App. 3d 503, 394 N.E.2d 63:

> "Determining what constitutes a 'substantial step' under our attempt statute has been one of the most troublesome problems of our criminal law. [Citation.] On the one hand, it is clear that mere preparation to commit a criminal offense does not constitute a 'substantial step' for purposes of the attempt statute. [Citation.] On the other hand, it is equally clear that to constitute an attempt it is not necessary to prove that the defendant performed the last deed immediately preceding that which would render the substantive crime complete. [Citation.] Each attempt case must be decided on its own unique facts, and the essential question which must be answered is whether, given the intent to commit a specific offense, the defendant performed acts bringing him in 'dangerous proximity to success in carrying out his intent.' " (75 Ill. App. 3d 503, 505; *People v. Paluch* (1966), 78 Ill. App. 2d 356, 222 N.E.2d 508.)

In the instant case, we find that the evidence is sufficient to establish that the defendant had performed acts which brought him in dangerous proximity to success in committing aggravated arson. He had threatened to burn the house down. He had purchased gasoline, carried it to the house and began pouring it beside the foundation of the wood frame structure. He ceased his activities only when the police officer drove up in front of the house. The only remaining step to be taken to complete the

arson was the igniting of the gasoline. As indicated, above, it is not necessary to prove that the defendant took the last step immediately preceding that which would render the substantive crime complete. Under the circumstances, we find that the evidence was sufficient for the jury to conclude that the defendant had taken a substantial step toward committing aggravated arson. Each case must be decided on its own facts. That he was later found to be without an ignition source does not alter our conclusion. The record does not indicate, nor will we presume, that Johnson knew that he was without an ignition source. It is as consistent with the evidence to conclude that he mistakenly believed that he did have an ignition source. As to this, we would note that it is no defense to an attempt charge that because of a misapprehension of circumstances it would have been impossible for him to commit the substantive offense. Ill. Rev. Stat. 1977, ch. 38, par. 8—4(b).

■■ The defense's next argument focuses upon the second requisite element of attempt in this case, the intent to commit aggravated arson. The defense argues that Johnson's actions, including his threats to burn the house down, only showed his intent to frighten Pankey into returning his gun. They also argue that no intent to commit arson is shown where the defendant knew he had no means of lighting the gasoline. Certainly, the bizarre circumstances of this case raise considerable doubts as to the defendant's intentions on that day. The intent question, given the circumstances, is a close one. He did threaten to burn the house down; he did obtain the gasoline; he did start pouring it beside the house. This evidence, by itself, is sufficient to support a conclusion that he intended to burn the house.

As noted above, there is no indication that he knew he was without matches or a lighter and the evidence is as consistent with a mistaken belief conclusion. However, despite the evidence indicating intent, there is other evidence supporting a conclusion that he did not have the intent. It was he who called the police to the dispute in the first place. While he made threats to burn the house, he did so in the presence of the officers and in a loud enough voice so that Pankey would hear him. Though it was mid-afternoon, he marched openly to his house, from there proceeding to the gas station, while the squad cars waited in the lot across the street from the service station. He then marched openly to Pankey's house and poured an amount of gasoline on the ground next to the house. The house, a wooden frame structure, had a concrete foundation. The ground was wet, covered with melting snow. Additionally, there was the fact that no ignition source was found on the defendant's person. Certainly, this evidence was consistent with the defense version of the incident, that the defendant's only intent was to frighten Pankey into returning his gun. It is consistent with the defense position that the defendant had no intent to

start the fire that afternoon. Essentially, the record in this case presents a close factual question on the question of the defendant's intent. The evidence could support a jury's conclusion either way on that issue. While we may not have reached the same result, the jury's conclusion that the defendant possessed the requisite intent is supported in the evidence. The evidence, however close, was sufficient to uphold the jury's verdicts.

However, with the closeness of the evidence in mind, we turn next to the alleged errors in closing argument by the prosecutor. The prosecutor clearly misstated the law of attempt to the jury. While his argument that impossibility is no defense to an attempt is arguably permissible on the facts of this case, his suggestion to the jury that a substantial step does not mean "dangerous proximity" and that they should not so find is directly contrary to the expressed law. (*People v. Brown* (1979), 75 Ill. App. 3d 503, 505.) As stated therein, the question in an attempt case is whether the defendant's acts brought him in " 'dangerous proximity to' success in carrying out his intent.' " While the prosecutor would have been justified in arguing that Johnson's conduct was a substantial step, and that was all that was necessary, he was not justified in expressly misinforming the jury on a critical element of the offense of attempt. The State is at a loss to explain or justify such a clear misstatement of law.

Further improper argument occurred with the prosecutor's comments, set out earlier, concerning the frequency and ease with which the reasonable doubt burden is met. (*People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86.) As the court in *Martinez* noted, such comment as was made here "had the effect of lessening the importance of the State's burden of proof by implying that reasonable doubt was merely a proforma or minor detail." 76 Ill. App. 3d 280, 285.

In addition to the above errors in argument, the prosecutor also made repeated reference to the uncontradicted and unrebutted nature of the State's case. While the State may legitimately argue that its evidence is uncontradicted and unrebutted, even though the only person who could rebut it is the defendant (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697), courts have not tolerated such argument when, because of the nature and extent of such comment, it can be concluded that the comment was calculated to direct the jury's attention to the defendant's failure to testify. (*People v. Johnson* (1976), 35 Ill. App. 3d 666, 341 N.E.2d 443; *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d 1028; *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773.) Here, the record reveals that the prosecutor repeatedly emphasized the uncontradicted nature of his case. Furthermore, he held up the property card (which indicated the defendant had no ignition source when arrested) and, holding it before the jury, stated: "This is the sum total, the whole defendant's case which was provided by the State." We find that the repeated verbal references

to the uncontradicted and unrebutted nature of the State's case, coupled with the emphasis supplied by the visual display of the property card, impermissibly focused the jury's attention on the defendant's failure to testify. The prosecutor exceeded the bounds of reasonable and proper comment.

To summarize, the record reveals that the prosecutor grossly misstated the law of attempt to the jury, that he de-emphasized the State's burden, and that he improperly focused upon the defendant's failure to testify. In addition to these significant errors there exists the clear error which occurred when Officer Osenga, during trial and before the jury, testified that the defendant told him he had been arrested before. Such evidence, tending to show that an accused had committed crimes or acts of misconduct distinct and unrelated to the offense for which he is being tried, is both incompetent and prejudicial. (*People v. Donaldson* (1956), 8 Ill. 2d 510, 134 N.E.2d 776; *People v. Goodwin* (1979), 69 Ill. App. 3d 347, 387 N.E.2d 433.) Here, the effect of the prejudice may have been somewhat lessened, in that the reference was only to an arrest, and an instruction to disregard was given. (But see *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650.) Nevertheless, the jury had been made aware that the defendant had previous encounters with the police and that he may have been involved in prior crimes. *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297; *People v. Richardson* (1977), 48 Ill. App. 3d 307, 362 N.E.2d 1104.

■■ In assessing the errors by the State, we must look at them individually and collectively, with consideration given to their cumulative effect and to the nature of the evidence against the defendant. Whether the errors require reversal depends upon the facts and circumstances of the individual case. (*People v. Walsh* (1980), 80 Ill. App. 3d 754, 400 N.E.2d 587.) In the instant case, given the closeness of the evidence, which we have already alluded to in a prior discussion, we conclude that the combined effect of the errors was sufficiently prejudicial so as to deprive the defendant of a fair trial. A reversal and remandment for a new trial is justified and required. The errors committed may well have constituted a material factor in the defendant's conviction, and the verdict may well have been different if the improper argument and evidence had not been presented. We reject the State's contention that the errors are harmless because the evidence of guilt was overwhelming. As noted, we find close factual questions in the case. Because of the closeness of the evidence on the attempt charge, and the serious and prejudicial nature of the errors, we find reversal required despite the defense's failure to object to some of the improper closing argument. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827; *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773.

130

We do not disturb the "resisting a peace officer conviction," however, since the evidence on that offense was overwhelming. We conclude that the best procedure, however, is to vacate the defendant's sentence on that conviction, given our reversal of the other conviction, and remand for resentencing. *People v. Hert* (1981), 95 Ill. App. 3d 871, 420 N.E.2d 813.

The defendant's conviction for attempt aggravated arson is reversed and that cause is remanded to the trial court for a new trial on the "attempt" charge. The conviction for resisting a peace officer is affirmed, but the sentence thereon is vacated, and the cause remanded for resentencing.

Reversed in part, affirmed in part, and remanded.

SCOTT, P. J., and BARRY, J., concur.