THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE LOZADA, Defendant-Appellant.

First District (5th Division)   No. 1—87—3248

Opinion filed March 28, 1991.

Randolph N. Stone, Public Defender, of Chicago (Greg Koster and Aaron Meyers, Assistant Public Defenders, of counsel), for appellant.

Jack M. O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David R. Butzen, and Howard D. Weisman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was found guilty of the offense of delivery of a controlled substance and was sentenced to a term of six years. He appeals, urging that the trial court erred when (1) it erroneously instructed the jury with the Illinois pattern instruction on entrapment (Illinois Pattern Jury Instructions, Criminal, No. 24.04 (1968)) (IPI entrapment instruction) which was unclear and confusing thereby resulting in an unfair trial, and (2) permitted the prosecutor to misstate the law of entrapment in his closing argument.

We affirm.

Relevant to our disposition are the following facts as they appear in the record. The State's primary witness was Officer Alfredo Ibanez (Ibanez), a special agent of the Illinois Department of State Police, Division of Criminal Investigations. His testimony of the events leading up to the defendant's arrest was as follows. On April 23, 1985, Ibanez met the defendant through Daniel Robles, who was under investigation and who had previously sold Ibanez an ounce of cocaine. In the ensuing conversation between the three men, Ibanez told the defendant that he was interested in buying a kilogram of cocaine. The defendant said that he could sell him the kilogram of cocaine for $60,000. Ibanez responded that $60,000 was too much, but the defendant said that he would be satisfied because the cocaine would be high grade. Ibanez still refused and counteroffered with $54,000. The defendant said that he would not go any lower than $54,000. The two men agreed to go ahead with the transaction at that price. Ibanez gave the defendant his beeper number, and the defendant gave Ibanez his home phone number. The defendant told Ibanez that he would page him in a few days.

Ibanez further testified that on Friday, April 26 he received a page on his beeper from the defendant. Ibanez returned the call. The defendant asked Ibanez if he was still interested in buying the kilogram of cocaine. Ibanez told the defendant that he needed time to get the money together. The defendant told Ibanez to meet him at Sportsman's Park at 5 p.m. that day. When the defendant arrived at Sportsman's Park he paged Ibanez again to find out if he would be there. Ibanez told the defendant that he wanted to postpone the transaction because Sportsman's Park was too isolated. Ibanez's real concern was for the safety of the undercover officers that would be on surveillance.

Ibanez further testified that three days later he called the defendant and they agreed to make the sale at 6 p.m. that day in a Jewel Food's parking lot at 5350 South Pulaski. The two men talked again on the phone, and the defendant told Ibanez to call him when he got to the Jewel parking lot. Ibanez met 15 to 20 undercover agents to finalize the details on the surveillance whereupon the team dispersed to the Jewel parking lot. Ibanez parked his unmarked car in the lot and went into the Jewel to call the defendant. The defendant said that he was on his way with Javier Ramirez. Ibanez knew of Ramirez through his dealings with Robles, but he had never spoken with him.

The defendant and Ramirez arrived in a green Pontiac and parked. They left the car and walked up to Ibanez, who was now standing outside his car. The defendant asked Ibanez if he had the money. Ibanez told the defendant the money was nearby and asked him if he had the cocaine. Ramirez gave Ibanez a key but remained silent. The defendant pointed to a blue Chrysler in another part of the parking lot and explained that the tape-wrapped cocaine and a knife were inside a box, which was inside a paper bag on the floor of the car. Ibanez testified that the defendant commented again that the cocaine was high grade. Ibanez went to the Chrysler, opened the bag on the floor, and sounded the alarm for the undercover agents to arrest Ramirez and the defendant. (Ramirez was tried separately.)

The defendant's testimony of the events leading up to his arrest was as follows. On April 23, 1985, Javier Ramirez had called and asked the defendant to meet him at 55th and Pulaski. When the defendant arrived he met Ramirez, Robles, and Ibanez. The defendant denied that he ever discussed the quality or haggled over the price of cocaine with Ibanez. The defendant denied ever giving Ibanez his home phone number when they were first introduced. The defendant believed that Ibanez got his home phone number from Robles. It was only when Ibanez called the defendant several days later that the subject of cocaine arose.

The defendant testified that, two to three weeks after their initial introduction, Ibanez called him asking if he could find some drugs. The defendant told Ibanez that he did not have any drugs. Ibanez said that he knew the defendant needed money and that Ibanez could help him get a job.

Two days later Ibanez called the defendant again. Ibanez reminded the defendant of his money problems, that Ibanez could help the defendant and his family, and that no one would get in trouble. The defendant still refused to help Ibanez. The next day Ibanez called the defendant and pressed the issue again. Ibanez told the defendant that someone would get him a job if he would do one favor. Ibanez reassured the defendant that he would be helping his family and that he would not get into trouble. This time the defendant agreed to do the favor.

The defendant contacted Ramirez. He told Ramirez that he had promised to sell cocaine to Ibanez but that he had no source to obtain the cocaine. Ramirez replied he would get the cocaine and told the defendant to ask a price of $45,000 for a kilogram. The defendant then called Ibanez and told him the cocaine was ready. The defendant then borrowed a junk car from his nephew and gave it to Ramirez to use in the transaction.

The defendant testified he was present at the transaction only because Ramirez asked him to come along to drive the extra car back from the Jewel parking lot. The defendant denied again that he commented on the quality of the cocaine to Ibanez. In fact, the defendant denied speaking a single word to Ibanez in the Jewel parking lot.

OPINION

■ At trial the defendant raised the entrapment defense, which has four elements: (1) the concept of committing the offense originated with the State, (2) which actively encouraged the defendant to commit the offense, (3) for the purpose of obtaining evidence for his prosecution, and (4) the defendant was not predisposed to commit the offense. (*People v. Gresham* (1981), 96 Ill. App. 3d 581, 421 N.E.2d 1053.) The judge gave the jury the IPI entrapment instruction. The defendant's objection to the IPI entrapment instruction was overruled and his alternative instruction was denied. On appeal, the defendant argues that the IPI entrapment instruction was unclear and confusing because it did not direct the jury's attention to the defendant's predisposition to commit the offense. Consequently, the defendant argues that he is entitled to a new trial.

The IPI entrapment instruction states:

"It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant he was incited or induced by a public officer to commit a[n] [offense.]

However, the defendant was not entrapped if a public officer merely afforded to the defendant the opportunity or facility for committing [the offense] in furtherance of a criminal purpose which the defendant originated." (Illinois Pattern Jury Instructions, Criminal, No. 24.04 (1968).)

In his brief, the defendant stated the only language contained in the IPI entrapment instruction that directs a jury's attention to the defendant's predisposition is the phrase "a criminal purpose which the defendant originated." The defendant then engaged in a semantic attack on the phrase and concluded that a jury might interpret the phrase as an instruction to consider the defendant's actions and not the defendant's predisposition. The only authority cited by defendant in support of his argument was Webster's Dictionary and the Random House Thesaurus.

■■ ■ In light of the defendant's semantic attack on the phrase, we note that Illinois courts have long held that the test of the correctness of an instruction is not what meaning the ingenuity of counsel can attribute to it, but how and in what sense, under the evidence before them, ordinary persons acting as jurors will understand the instruction. (*Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 394 N.E.2d 1241.) In this regard, the evidence before the jurors was sharply divided on the issue of the defendant's predisposition. Officer Ibanez's testimony indicated that the defendant was associated with known drug dealers; that he knew the going price for a kilogram of cocaine; that he continually commented on the quality of the cocaine; that he arranged to have an extra car for the transaction; and that he was physically present when the transaction occurred. The defendant's testimony indicated that he did not give his phone number to Ibanez; that Ibanez called him several days after they met to discuss the subject of cocaine; that he continually told Ibanez that he did not have any drugs; that he never commented on the price or the quality of the cocaine; that Ibanez finally pressured him into agreeing to do a "favor"; and that he was present at the transaction only because Ramirez asked him to come along to drive the extra car back from the Jewel parking lot. The jury considered the weight and credibility of the above testimony and then, after being instructed on the entrapment defense, decided that the defendant was guilty. Under these circumstances, we conclude

that the jury understood that the defendant was predisposed to commit the crime.

We also add that the Illinois Supreme Court has ruled on the correctness of the same phrase which the defendant complains of. In one case, the trial court deleted the phrase "in furtherance of a criminal purpose which the defendant originated" and replaced it with "which he was willing to commit." (*People v. Pates* (1981), 84 Ill. 2d 82, 87, 417 N.E.2d 618, 620.) The supreme court ruled that this was improper because the deletion of the phrase "could lead the jury to believe that the State could rebut the claim of entrapment without showing that the defendant had been *predisposed* to the commission of the offense." (Emphasis added.) (*Pates*, 84 Ill. 2d at 87, 417 N.E.2d at 620.) Therefore, the supreme court is of the opinion that the phrase in issue does direct the jury's attention to the defendant's predisposition.

In another case, the supreme court interpreted the entrapment statute which contains the same language as the IPI entrapment instruction. (*People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.) The supreme court concluded that the language "contemplates consideration of whether the idea for the crime originated with the defendant; *predisposition* as well as governmental involvement must therefore be considered." (Emphasis added.) *Cross*, 77 Ill. 2d at 405, 396 N.E.2d at 816.

■ Because the supreme court has determined that the IPI entrapment instruction contemplates the defendant's predisposition, we hold that its submission to the jury in this case does not entitle the defendant to a new trial.

The defendant also contends that the prosecutor seriously misstated the law during his closing argument. The portion of the prosecutor's closing argument in issue appeared in the record as follows:

"[THE PEOPLE]: He says the reason he was entrapped was because he had no background and he had no predisposition. Well, you don't get a free bite the first time you commit an offense because you commit this delivery because you never did it in the past. If you were to follow his logic, ladies and gentlemen, dope dealers who did a big deal to a cop the first time could never be convicted.

[DEFENSE COUNSEL]: That's not true.

[THE COURT]: That's counsel's argument."

■ We agree that the above was a misstatement of the law on entrapment. As the defendant points out, a defendant who commits a first-time big deal to a police officer *can* be convicted if the evidence shows he was predisposed. (*People v. Cross* (1979), 77 Ill. 2d 396, 396

N.E.2d 812; *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528.) Here, however, the issue is whether the misstatement of the law was serious enough to entitle the defendant to a new trial.

■▊ ▊ Whether a prosecutor's misstatement of the law entitles a defendant to a new trial depends on the circumstances of each case. (*People v. Cobb* (1989), 186 Ill. App. 3d 898, 542 N.E.2d 1171.) An appellate court must consider the misstatement of the law in the context of the argument and in light of the entire record to determine if it was harmless or prejudicial error. (*People v. Duckworth* (1981), 98 Ill. App. 3d 1034, 424 N.E.2d 1337; *People v. Johnson* (1981), 102 Ill. App. 3d 122, 429 N.E.2d 905.) A nonexhaustive list of factors for the appellate court to consider includes: whether the prosecutor correctly stated the law in other parts of the argument; whether the defendant objected to the misstatement of the law; whether the judge properly instructed the jury on the law and reminded the jury that the arguments of the attorneys did not constitute evidence; and whether the misstatement of the law constituted a material factor in the defendant's conviction. *Duckworth*, 98 Ill. App. 3d 1034, 424 N.E.2d 1337; *Johnson*, 102 Ill. App. 3d 122, 429 N.E.2d 905; *Cobb*, 186 Ill. App. 3d 898, 542 N.E.2d 1171.

■ Here, the misstatement of the law was made during the rebuttal of the prosecutor's closing argument. Earlier in the closing argument, however, the prosecutor correctly stated the law on entrapment. Also, when the prosecutor finished the misstatement of the law, the defense counsel interrupted, saying "[t]hat's not true." At various times during the trial the judge reminded the jury that "I will instruct you on the law." Before the jury retired, the judge gave the correct instruction in the form of the IPI entrapment instruction. Also, much of Officer Ibanez's testimony and the attorneys' arguments directed the jury's attention to the issue of the defendant's predisposition. This fact mitigates the effect of the misstatement of the law such that it is unlikely it was a material factor in the defendant's conviction.

Considering the misstatement of the law in the context of the argument and in light of the entire record, we hold that it was harmless error.

Affirmed.

MURRAY and McNULTY, JJ., concur.