THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEOFFREY TRUSS, Defendant-Appellant.

First District (6th Division)   No. 1—90—1426

Opinion filed May 14, 1993.—Modified on denial of rehearing September 24, 1993.

Rita A. Fry, Public Defender, of Chicago (Tina Liebling, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen M. O'Neill, and Carrie W. Rosenbloom, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

After a jury trial, defendant Geoffrey Truss was found guilty of the first degree murder of Kenneth Geralds. The trial court subsequently sentenced him to a term of 40 years. On appeal, defendant contends that: (1) the trial court committed reversible error by giving the jury two issues instructions on first degree murder, the first of which did not inform the jury that if it found the elements of first degree murder it must go on to determine whether defendant had proved a mitigating factor so as to reduce the offense from first to second degree murder; (2) the trial court erred by excluding evidence regarding defendant's state of mind; (3) the trial court erred in giving an improper non-Illinois Pattern Jury Instruction; (4) he was deprived of a fair trial by the prosecutor's repeated misstatements of law and fact in closing argument; (5) the trial court erred in refusing to inform

a juror opposed to the death penalty that this was not a capital case; (6) the Illinois murder statute is unconstitutional as a violation of due process; and (7) the trial court abused its discretion by permitting the State to use his two prior convictions to impeach him.

The following relevant facts were elicited at trial. Jerry Jenkins testified for the State that on July 3, 1987, the date the deceased was killed, he was living with his mother, Patricia Jenkins, his sister, his brother and defendant, who was his mother's boyfriend. At approximately midnight or 1 a.m. on July 3, Jerry was sitting on his front porch with two friends when his mother came home accompanied by the deceased. Shortly thereafter, defendant came home and sat on the porch talking to Jerry and his friends for 20 or 30 minutes before going inside. At some point, Jerry heard a loud commotion occurring inside the house. He went inside to investigate and found defendant standing in a doorway near the bathroom holding a knife in his right hand, with his forearm parallel to the floor and extended in front of him.

Jerry saw the deceased sitting in a chair in the dining room with a small bloodstain on the left side of his chest. While Jerry attempted to stop the bleeding, he heard defendant throw the knife into the bathroom and go into the bedroom.

Jerry stated on cross-examination that he had a good relationship with defendant and that defendant did not show any signs of anger towards him or his friends prior to entering the house, nor was he generally in a violent or angry mood. Jerry was not in the house when the deceased was stabbed and, thus, did not see the events which led to the stabbing. According to Jerry, defendant never attempted to hide the knife or flee from the scene.

Jennifer Jenkins, Jerry's sister and Patricia's daughter, was also home when the deceased was stabbed. She was in her bedroom with her three-month-old daughter. From the bedroom, she heard her mother and the deceased talking and laughing in the dining room. Sometime later, she heard defendant tell her mother to "come here" followed by steps to the kitchen and then back to the dining room. She then heard a little noise and her mother screaming, "Why did you do it, Geoffrey?" Jennifer came out of her bedroom to see what had happened, and Jerry told her to call the police.

John Maciejewski, a Chicago police officer, testified for the State that he responded to a call of a man stabbed and proceeded to defendant's house. When he arrived, he observed the deceased sitting in a chair in the dining room and Jerry holding a towel to the deceased's chest. Defendant told Maciejewski that he had stabbed the deceased.

Defendant extended his hands out towards Maciejewski, and Maciejewski handcuffed him. Maciejewski later found a butcher knife on the bathroom floor.

Detective Donald Barton of the Chicago police department interviewed Patricia and Jennifer Jenkins, as well as defendant. After defendant was advised of his constitutional rights and indicated he understood them, he gave Barton a statement of the events which led to the stabbing. According to Barton, defendant stated that when he came home around 2 a.m. on the morning in question, Patricia was sitting at the dining room table with the deceased. Defendant had met the deceased once before. Defendant had lived in the house with Patricia for approximately nine months prior to the stabbing. Defendant went into the bedroom and shortly thereafter called for Patricia. He told her to tell the deceased to leave, and Patricia stated that he would leave in a few minutes. After several minutes, defendant again asked Patricia to tell the deceased to leave, but the deceased remained. Defendant came out of the bedroom, went over to the dining room table, and argued with the deceased. The deceased pushed him, and defendant "faked, like he was going away or moving away" and went into the kitchen. He picked up a kitchen knife and returned to the dining room and stabbed the deceased in the chest. According to Barton, defendant said he stabbed the deceased because he was angry that the deceased was still in the house.

On cross-examination, Barton stated that defendant was not wearing a shirt at the time Barton questioned him. Barton added that defendant was cooperative in talking with him.

Barton also stated that defendant told him that prior to Patricia leaving the house the evening before the stabbing, she and defendant had an argument and she told defendant he "would be sorry later." Defendant told Barton that while the deceased was in the house, he felt that the bedroom "was not the place to be"; that he felt "unsafe"; and that he thought Patricia brought the deceased to the house to make defendant sorry or angry. Defendant further informed Barton that he was calm when he told Patricia to ask the deceased to leave. When he came out to the dining room table, the deceased put his hands on defendant or pushed him. This occurred after defendant told Patricia that he "wanted to feel safe." Defendant told Barton that he and the deceased never exchanged words. Defendant could not explain to Barton what he meant by the words "he wanted to feel safe." Defendant stated that he was "very angry" at the deceased, but not that he stabbed him because he was angry.

Assistant State's Attorney Linas Kelecius interviewed defendant several hours after the stabbing. He took a statement from defendant which was substantially the same as that testified to by Barton. According to Kelecius, defendant read the statement silently, stated "that's pretty much the way it happened," but then refused to sign it because it was "inaccurate."

Doctor Joanne Richmond, a Cook County medical examiner, testified that the deceased's death was due to massive bleeding from the stab wound of the lung and aorta. The stab wound was to the left chest, just below the left collar bone. On cross-examination, Doctor Richmond stated that the location of the wound would be the closest point to someone standing in front of the deceased as the latter was raising himself out of the chair. She added that the deceased's blood tested positive for the presence of alcohol.

Patricia Jenkins testified for the State that at approximately 9 or 9:30 p.m. on July 2, she went to her cousin's house, where she had a few beers. She later went to a lounge where she met the deceased, who had been a friend of hers for several years. At approximately 1 a.m., the deceased drove Patricia home, and she invited him in for a beer. They sat in the dining room and each drank a beer. Shortly thereafter, defendant returned home. She introduced the deceased to defendant, and defendant went into the bedroom and called for Patricia. Defendant told Patricia to tell her company to leave, to which she replied, "Okay, in a minute." She went back to the dining room, and she and the deceased continued to talk. A short time later, defendant again called Patricia into the bedroom and began yelling. He told her to tell her company to leave and she said she would in a minute. Patricia left the bedroom and returned to the dining room. Defendant entered the dining room and said, "I told you it was time for your company to leave." She continued to talk while defendant went into the kitchen and came back to the dining room. She saw his arm go up, and "the next thing [she] knew [the deceased] was stabbed." Defendant was facing the deceased and his back was to Patricia; she only saw his raised hand.

On cross-examination, Patricia admitted that she once told defendant she had "cut" her ex-husband when he was asleep, not because it was true, but because she wanted defendant to believe that she had done it. She had consumed approximately nine containers of beer before returning home on the morning in question. This was the first time she had ever had another man over at 2:15 a.m., and to the best of her knowledge, defendant did not know the deceased.

She also stated that the deceased said nothing when defendant initially entered the dining room, and that the deceased was aware that defendant lived there with Patricia. Defendant was not invited to join Patricia and the deceased, so he went in the bedroom. The first time defendant called Patricia in the bedroom, his voice was calm. She did not ask the deceased to leave, nor did he leave on his own. She denied that the deceased pushed or threatened defendant.

Frank Marino, who represented defendant prior to being replaced by private counsel, testified for defendant that he conducted an interview of Patricia wherein she stated that she did not see a knife in defendant's hand at the moment the deceased was stabbed, nor did she see defendant stab the deceased. She saw the bloodied knife for the first time after the stabbing when it was in defendant's hand.

Defendant testified that on the evening of July 2 he and Patricia had an argument. Patricia told him that he would "be sorry later" and she left the house. Defendant then went to Patricia's cousin's house. Sometime later, he returned home and discovered that Patricia had not yet returned, so he went back to her cousin's house. A few hours later, he came home to find Patricia and the deceased sitting in the dining room. He had never seen the deceased before that evening. Patricia introduced the two men and defendant started to extend his hand. The deceased did not reciprocate and did not acknowledge him in any way. Consequently, he went into the bedroom and began to undress for bed. At that point, he started to feel "unsafe." Approximately eight months earlier Patricia told defendant that she had "cut" her ex-husband while he was asleep.

At this point, he called Patricia into the bedroom and calmly asked her to dismiss her company. Patricia just looked at him and returned to join the deceased. He called for Patricia again. When she did not come, he put on his trousers, went to the dining room, and again asked her to dismiss her company. Defendant was standing between Patricia and the deceased. The deceased arose from his chair, took a step towards defendant and grabbed his arm. In response, defendant pulled his arm back. The deceased was glaring at defendant. Defendant was frightened and walked into the kitchen. He started to walk out of the kitchen "to see what was going on" when he saw a knife on the kitchen table. He picked up the knife, not to hurt the deceased, but to protect himself. Defendant thought that if the deceased saw the knife he would leave defendant alone. Defendant walked up to the deceased with the knife down and not concealed, and said "Look—." The trial court did not allow him to complete the sentence. The deceased arose from the chair and started coming at

defendant. Defendant "just reacted" and stabbed the deceased. After he stabbed the deceased, he turned and asked Patricia what was going on. Defendant admitted that he never told the police that the deceased arose from his chair and came after him.

Officer Robert Baker of the Chicago police department testified for defendant that after the stabbing he had a conversation with Patricia, and she told him that she did not see what happened. On cross-examination, Baker acknowledged that Patricia was hysterical at the time he spoke with her. The defense recalled Barton, who testified that Patricia never told him that defendant first approached the dining room table before going into the kitchen and retrieving the knife.

■ We first consider defendant's contention that the trial court violated his constitutional right to due process by giving the jury two instructions on first degree murder, the first of which did not inform the jury that if it found the elements of first degree murder, it must go on to determine whether defendant had proved the existence of a mitigating factor sufficient to reduce the offense from first to second degree murder. Relying on the Seventh Circuit's holding in *Falconer v. Lane* (7th Cir. 1990), 905 F.2d 1129, defendant contends that the manner in which the instructions were given constitutes *per se* reversible error because it may well have caused the jury to fail to continue with deliberations on the issue of second degree murder after it determined that the State had proved the elements of first degree murder beyond a reasonable doubt.

In *Falconer*, the trial court first instructed the jury on the offense of murder and then instructed the jury on the lesser offense of voluntary manslaughter. The instructions merely defined for the jury the elements of each offense. Thus, the murder instruction did not instruct the jury to continue with deliberations on the issue of voluntary manslaughter once it had determined that the State proved all the elements of murder. The Seventh Circuit held that the trial court violated the petitioner's right to due process by instructing the jury in a manner which failed to convey the relationship between murder and voluntary manslaughter, and, in particular, failed to make clear to the jury its duty to continue deliberating, once it found that the State had proved the elements of murder, to determine whether a mitigating factor existed to reduce the offense to voluntary manslaughter. (*Falconer*, 905 F.2d at 1136-37.) In this context, the court found it significant that the murder instruction preceded the two voluntary manslaughter instructions, noting that "[j]urors are therefore encouraged by the structure of the instructions to answer its requirements first

and then move on only if those requirements cannot be met." *Falconer*, 905 F.2d at 1136.

We find the situation in this case to be distinguishable from that in *Falconer*. Unlike in *Falconer*, the trial court here did in fact convey to the jury, in an instruction, the relationship between first degree murder and the lesser offense of second degree murder. In that same instruction, the trial court also apprised the jury of its duty to continue with deliberations, once it found that the State had proved the elements of first degree murder, to determine whether a mitigating factor had been proved to reduce the offense to second degree murder.

Moreover, as a final instruction prior to deliberations, the trial court summarized for the jury its responsibilities by stating:

"The defendant is charged with the offense of first degree murder. Under the law a person charged with first degree murder may be found not guilty or guilty of first degree murder or guilty of second degree murder. *If you find the State has proven the defendant guilty beyond a reasonable doubt of the offense of first degree murder you must then decide whether defendant has proved by a preponderance of the evidence that defendant is guilty of a lesser offense of second degree murder.* Accordingly, you will be provided with three verdict forms, not guilty, guilty of first degree murder and guilty of second degree murder. From these three verdict forms you should select the one verdict form that reflects your verdict and sign it as I have stated." (Emphasis added.)

Considering the jury instructions in their entirety, as the court in *Falconer* did in arriving at its holding, we conclude that the jury was more than sufficiently informed both of the relationship between first and second degree murder and of its duty to consider whether a mitigating factor existed so as to reduce the offense from first to second degree murder. We reach this conclusion notwithstanding that the instruction defining the elements of first degree murder was read before the instruction discussing the relationship between first and second degree murder. In our view, the order of the instructions became significant in *Falconer* only because the jury was *never* instructed as to the relationship between murder and voluntary manslaughter or that it *must* consider the mitigating factors for voluntary manslaughter before it could return a guilty verdict for murder. In this case, the jury was twice so instructed. Accordingly, we decline to find that the manner in which the instructions were given here constitutes reversible error.

■ Defendant also argues that the trial court erred in excluding evidence regarding his state of mind at the time he stabbed the deceased. Defendant points initially to the following question asked of Patricia Jenkins on cross-examination, the answer to which the trial court excluded upon the State's general objection: "Did you ever tell Mr. Truss [defendant], in the past, that there were occasions where other men had offered to come over and take care of your ex-husband for you?" We agree with defendant that the trial court erred in excluding Patricia's response to this question, as it was being used to show the effect on defendant's state of mind. (*People v. Kline* (1980), 90 Ill. App. 3d 1008, 1012, 414 N.E.2d 141, 144.) However, we consider the error to be harmless, in light of the fact that defendant was permitted to offer other evidence of his state of mind. Specifically, defendant testified that he started to feel "unsafe," that Patricia told him that night that "he'd be sorry later," and that eight months before the stabbing, Patricia told defendant that she cut her ex-husband while he was asleep. Additionally, defense counsel was permitted to ask Patricia on cross-examination whether she in fact had made these statements. Defense counsel was also permitted to ask her whether she told defendant that one of the reasons she invited the deceased over on the morning in question was "to make a point to" him.

As the foregoing indicates, defendant was afforded ample opportunity to establish his state of mind at the time of the stabbing. The response which defendant sought to elicit from Patricia was cumulative of the type of evidence already established. Moreover, perhaps even more significant than Patricia's response to the question posed (which likely would have been "no," as were most of her responses to similar questions) was the question itself, which the jury did in fact hear. Accordingly, any error in the trial court's refusal to allow Patricia's response was harmless.

■ Defendant also maintains that the trial court should have permitted him to testify as to what he was about to say to the deceased at the moment just prior to the stabbing.

However, defendant did not make an offer of proof. We have no way of knowing, therefore, what the substance of defendant's testimony would have been, nor do we know for certain that what defendant "was about to say" was in fact probative on the issue of his state of mind, as defendant argues, or whether it would have been inadmissible hearsay. In our view, the substance of defendant's testimony was not obvious, and, therefore, an offer of proof was required. See, *e.g., People v. Cobb* (1989), 186 Ill. App. 3d 898, 542 N.E.2d 1171.

■ Defendant also asserts that the trial court erred by giving the jury the following State-tendered non-Illinois Pattern Jury Instruction (IPI), which was derived from this court's opinion in *People v. Harris* (1984), 123 Ill. App. 3d 899, 906, 463 N.E.2d 1030, 1035:

"The law does not permit one who instigates an assault on another to then rely on the victim's response to that assault as evidence of mutual combat sufficient to mitigate a subsequent killing from murder to manslaughter."

We agree with defendant that the tendered instruction was an improper one because there was no evidence of mutual combat presented in this case. However, one superfluous or misleading jury instruction does not necessarily require a reviewing court to reverse (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 569, 444 N.E.2d 609, 622), and because the trial court properly instructed the jury as to those mitigating factors which would suffice to reduce the offense from first to second degree murder, we decline to do so here.

■ Next, defendant argues that he was deprived of a fair trial as a result of the prosecutor's misstatements of law and fact in closing argument. At the outset, we note that improper comments on the part of the prosecutor in closing argument are not reversible error unless they constitute a material factor in the defendant's conviction or result in substantial prejudice to the accused. (*People v. Manley* (1991), 222 Ill. App. 3d 896, 907, 584 N.E.2d 477, 487.) In determining whether the prosecutor's comments or arguments constituted prejudicial error, the test employed is whether the jury would have reached a contrary verdict had the improper remarks not been made. *Manley*, 222 Ill. App. 3d at 908, 584 N.E.2d at 487.

Defendant first argues that he was prejudiced by the prosecutor's erroneous statement of the law of self-defense. We agree with defendant that the prosecutor's statement was improper; however, in light of the overwhelming evidence of defendant's guilt—including defendant's own testimony admitting that he stabbed the deceased, Barton's testimony recounting defendant's statement of the incident, in which defendant made no mention that the deceased lunged at him immediately before he stabbed the deceased, and Patricia's eyewitness testimony that she saw defendant's arm go up and "the next thing [she] knew [the deceased] was stabbed," together with her testimony that the deceased did not push or threaten defendant—we cannot conclude that the statement constituted a material factor in defendant's conviction or resulted in substantial prejudice to him. Moreover, we note that the trial court, in response to defense counsel's objection expressly proclaiming the "misstatement as to the law," admonished the

jury that it would instruct it as to the law to be applied, and subsequently did properly instruct the jury as to the law of self-defense.

Defendant also contends that he was prejudiced by the prosecutor's reference in closing argument to the fact that none of the State's witnesses had been convicted of a felony and that Patricia had never even been arrested, when no proof of this was offered at trial. Our review of the record indicates, however, that defendant did not object contemporaneously to the comments at trial and failed to specify the comments as error in his post-trial motion. Therefore, we consider any error in such comments to have been waived. (*People v. Torres* (1985), 130 Ill. App. 3d 775, 780, 474 N.E.2d 1305, 1309.) Moreover, the trial court instructed the jury that closing arguments were not evidence and that any statement or argument made by the attorneys that were not based on the evidence should be disregarded.

Defendant also argues that he was prejudiced by the prosecutor's attempt in closing argument to define the term "apparent" in the context of the defense of justifiable use of force. The prosecutor presented a hypothetical to assist in defining the term, to which defense counsel objected. While improper, we cannot conclude that the presentation of the hypothetical warrants reversal in light of the overwhelming evidence of defendant's guilt, together with the fact that the trial court sustained defense counsel's objection, prior to deliberations gave the jury the correct instruction regarding justifiable use of force, and admonished the jury that arguments of the attorneys did not constitute evidence. See *People v. Lozada* (1991), 211 Ill. App. 3d 817, 570 N.E.2d 737.

Defendant asserts that the cumulative effect of the prosecutor's comments substantially prejudiced the jury. We find this argument to be unpersuasive. Where a defendant has failed to establish that any individual comments require reversal, a court of review will not order a new trial based upon the "cumulative effect" of alleged errors. (*People v. Albanese* (1984), 102 Ill. 2d 54, 83, 464 N.E.2d 206, 220.) As we have demonstrated, we do not believe defendant has established that his conviction should be reversed or that he is entitled to a new trial as a result of any one of the prosecutor's allegedly improper comments. Accordingly, reversal is not warranted on the ground of cumulative error.

■ Defendant also argues that the trial court erred by refusing to instruct a prospective juror opposed to the death penalty that this was not a case in which defendant, if convicted, would be eligible for the death penalty. The venireperson stated that he would be hesitant to return a guilty verdict because of his opposition to the death pen-

alty. The trial court instructed the venireperson that he was not to concern himself with sentencing, but only with defendant's guilt or innocence. Nevertheless, the venireperson stated that he would hesitate to return a guilty verdict against defendant. As a result, the trial court dismissed the prospective juror for cause. Subsequently, at defense counsel's request, the trial court instructed the remaining venirepersons that this was not a capital case.

Although the trial court would have been well advised to inform the venireperson that this was not a capital case prior to dismissing him for cause, the fact that it did not does not alone constitute reversible error. Where the death penalty will not be imposed, it cannot be said, absent additional evidence of prejudice to defendant, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury *on the issue of guilt* or substantially increases the risk of conviction. Thus, the exclusion of jurors opposing the death penalty is not *per se* reversible error. (*People v. Connolly* (1973), 55 Ill. 2d 421, 428-29, 303 N.E.2d 409, 413, citing *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) Defendant has offered no evidence that he was prejudiced by the trial court's decision to dismiss this potential juror for cause. Accordingly, we decline to find reversible error.

■ Defendant next contends that the Illinois murder statute (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 9—2) is unconstitutional as a violation of due process because it requires him to prove that he lacked the mental state required for first degree murder in order to be convicted of the lesser offense of second degree murder. This court has on numerous and recent occasions considered and rejected this specific challenge to our murder statute. (See, *e.g., People v. Newbern* (1991), 219 Ill. App. 3d 333, 579 N.E.2d 583; *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373; *People v. Doss* (1991), 214 Ill. App. 3d 1051, 574 N.E.2d 806; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.) We see no reason to revisit this all-too-familiar challenge here.

Defendant raises a second due process challenge to our murder statute. He argues that where a defendant asserts self-defense but is convicted of second degree murder, the mitigating mental state necessary for second degree murder (unreasonable belief of justification), which the statute requires the *defendant* to prove, has actually been proved partly by the defendant and partly by the State: The defendant has proved the existence of his belief and the State has proved that his belief was unreasonable. In defendant's view, a defendant can never prove the unreasonableness of his belief because to do so would

negate his theory of defense—that he acted reasonably in self-defense. As the requirement of the statute—that the defendant alone prove the mitigating factor of unreasonable belief in self-defense—can never be met under the scenario presented by defendant, a jury following the statute must always convict the defendant of first degree murder and never of second degree. This violates a defendant's right to due process, defendant urges, because a defendant can never prove that his belief in self-defense is unreasonable for purposes of the lesser offense of second degree murder without helping the State prove him guilty in the first instance of first degree murder (by conceding that he did not reasonably believe that the force which he used was justified).

A careful reading of the murder statute supports our conclusion that the argument is without merit. In a situation where evidence of both first and second degree murder is presented and where defendant claims self-defense, the statute expressly states that the *State* bears the burden of proving beyond a reasonable doubt not only the elements of first degree murder but also that the defendant was not justified in using the force which he used. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(c); Illinois Pattern Jury Instructions, Criminal, No. 7.06A (2d ed. Supp. 1987).) If the *State* is unable to prove this latter element, then the jury has no alternative but to find the defendant not guilty of first degree murder and its deliberations must end. (IPI Criminal 2d No. 7.06A (Supp. 1987).) However if the State has successfully negated defendant's claim of self-defense and has proven each of the other elements of first degree murder, then, and only then, may the jury proceed to a determination of the issue of second degree murder.

If the jury then finds the defendant guilty of second degree murder, it has effectively concluded that the evidence which the defendant has offered, while not sufficient to support his claim of self-defense, was sufficient to prove the mitigating factor necessary for the lesser offense of second degree murder. At no point does he negate his own defense (that he acted reasonably in self-defense). Rather, he has presented the best evidence for his defense, and the jury has found that it only supports a finding of second degree murder and not absolute justification for his actions. Accordingly, we reject defendant's line of reasoning and continue to find that the murder statute comports with due process.

■ Defendant finally contends that the trial court abused its discretion in permitting the State to impeach defendant with two felony convictions, one 13 years old and the other 9 years and 9 months old as of the date of his trial. Although the jury was only informed of the

date of the convictions and the fact that they were convictions for felonies, defendant nevertheless argues that the mere mention of the convictions was error because (1) their probative value was substantially outweighed by the danger of unfair prejudice; and (2) as to the 13-year-old conviction, the State failed to offer any evidence demonstrating that less than 10 years had elapsed between the date of conviction or release of defendant from confinement, whichever is later, and the date of trial, as mandated by our supreme court in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.

It is well settled that the trial court in its sound discretion may permit the State to use a defendant's prior conviction to impeach the credibility of his testimony if: (1) the conviction involved a crime which is punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment; and (2) the trial court determines that the probative value of the conviction outweighs its prejudicial effect. *Montgomery*, 47 Ill. 2d at 516, 268 N.E.2d at 698.

Defendant contends that the trial court failed to balance the probative value of the convictions against their prejudicial effect. Had it done so, defendant argues, it would have determined that the convictions held little probative value but great prejudicial effect. Although the record does not expressly indicate that the trial court performed the required balancing test, we cannot say that the trial court did not implicitly do so prior to making its determination of admissibility. It is not necessary that the record contain an affirmative statement concerning the factors considered by the trial court in reaching its determination. (*People v. Washington* (1973), 55 Ill. 2d 521, 523-24, 304 N.E.2d 276, 277.) Moreover, we note from the record that the trial judge was cognizant of *Montgomery* and was aware of the potential for prejudice, as evidenced by the court's compromise ruling allowing defendant's request to preclude the State from revealing the nature of the offenses of which he was convicted. As to the most recent conviction, therefore, the trial court did not abuse its discretion in allowing the State to use it to impeach defendant's credibility.

As to the earlier conviction, our review of the record fails to reveal on what date defendant was released from custody on that conviction. Absent proof that less than 10 years had elapsed between the later of the date of conviction or release of defendant from confinement and the date of trial, the trial court should not have allowed evidence of the conviction to be admitted. However, because the jury was only apprised of the date of the felony and not the nature of the

offense, we cannot say that defendant was substantially prejudiced by its admission.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

EGAN and GIANNIS, JJ., concur.